UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

───────────────────────────────

ROBERT E.W., Jr.,

                       Plaintiff,

                                                             **DECISION AND ORDER**
      v.                                                            23-CV-556-A

COMMISSIONER OF SOCIAL SECURITY,

                       Defendant.

───────────────────────────────

## I. INTRODUCTION

Plaintiff Robert E.W., Jr., represented by counsel, brings this action against the Commissioner of Social Security (hereinafter the "Commissioner"), seeking review of the Commissioner's determination denying Plaintiff disability insurance benefits ("DIB") under the Social Security Act (the "Act"). This Court has jurisdiction over the matter pursuant to 42 U.S.C. § 405(g). Before the Court are Plaintiff's (Dkt. 6) and the Commissioner's (Dkt. 9) cross-motions for judgment on the pleadings, and Plaintiff's reply (Dkt. 10). For the reasons set forth below, the Plaintiff's motion is **DENIED**, and the Commissioner's motion is **GRANTED**.

## II. PROCEDURAL HISTORY

On July 28, 2020, Plaintiff filed an application for Title II period of disability and disability insurance benefits, alleging disability beginning on March 17, 2020. T.26,

79, 215.[1]   Plaintiff, who was born on September 22, 1964, and was 55 years-old at the time he filed, is considered an individual of advanced age. *Id.*; *see*, 20 C.F.R § 404.1563(e) (considering one who is 55 or older a "person of advanced age"). In seeking disability benefits, Plaintiff alleged that he was disabled due to bilateral retinal branch artery occlusion, partial site blindness of the left eye, Raynaud's Phenomenon, Type II diabetes, and chronic lymphocytic leukemia. T.48–59, 257. Plaintiff has an 11th grade education, with past relevant work experience as a truck driver, a food service manager, and as the general manager of several "gentlemen's clubs."  T.26, 44, 231-239, 897.

His disability claim was denied initially on January 19, 2021, T.118, and upon reconsideration on April 15, 2021. T.127.  Plaintiff requested a hearing, and on February 2, 2022, represented by counsel, Plaintiff appeared and testified at such hearing  before Administrative Law Judge ("ALJ") Flor M. Suarez. T.34-77. A vocational expert also testified at the hearing. T. 67-76. The ALJ issued an unfavorable decision on August 8, 2022. T.13-33. Plaintiff exhausted his

---

[1] References herein preceded by "T" are to consecutively paginated, Bates-stamped pages within the administrative transcript of official proceedings in this case. Dkt. 5. The Court notes that Plaintiff received unemployment insurance benefits during the first, second, third, and fourth quarters of 2020, and during the first, second, and third quarters of 2021. T.246. As the ALJ noted, in so doing, he certified weekly by computer that he was ready, willing, and able to work, and actively looking for work during each week in which he claimed benefits. T.19. Nevertheless, Plaintiff testified that he did not actively look for work. *Id*. As the ALJ indicated, under these circumstances, his collection of unemployment insurance benefits is at least to some degree at odds with his claim that was "disabled" during that same period. *Id.*

administrative remedies, culminating in a denial from the Appeals Council on April 20, 2023. T.1-7. Thereafter, this timely action was filed.

## III.    FACTS

### A. *Plaintiff's Treatment Records*

On May 20, 2020, Plaintiff visited Roswell Park Cancer Center to be seen for follow-up surveillance for his chronic lymphocytic leukemia; Plaintiff had not demonstrated any disease recurrence since he completed chemotherapy for the condition in February 2018. T. 608. Plaintiff received regular screenings and intravenous immunoglobin (IVIG) infusions to protect against immunodeficiency. T.605; 611; 818-819; 940; 942-944; 953-957; 960-963.

Beginning in about mid-2020, Plaintiff began complaining about vision issues. T. 706. At first, it was suspected that his vision issues, including floaters in his right eye, pressure in his head, and peripheral flashes, were related to acute sinusitis from which he was then suffering, and he was advised to see an ophthalmologist if it did not clear up with treatment for the sinusitis. T.709-712.  At follow-up visits with various ophthalmologists, Plaintiff reported visual issues including blurred vision and floaters. T.614, 628, 670-674.  Plaintiff reported that he was beginning to lose vision, he had blurred vision left eye greater than right eye; he had floaters; his condition was worsening; he had flashes; and reading, watching TV, computer work, work, and driving were impacted. T.599, 620, 670-675.  Tests showed no evidence of diabetic retinopathy, although an acute branch retinal artery occlusion of the left eye

3

was discovered, as was grade II hypertensive retinopathy of both eyes; and there was chronic posterior vitreous detachment of both eyes. T.600.

During 2020, Plaintiff went for a cardiology consultation to rule out cardiac causes of embolism after bilateral retinal artery occlusions were found. T.647. While Plaintiff complained of chest pains, a neurology consult was recommended as his cardiologist noted that his chest pains did not seem to be related to any cardiac issues. T.648. Echocardiography showed moderate-sized shunt at the left interatrial septum and trace insufficiency of all four cardiac valves. T.645-646. In the Summer of 2020, a transesophageal Echo showed mild mitral valve regurgitation (increase) and moderately dilated bilateral atrium. T.640-641. In the Fall of 2020, a transcranial Doppler was ordered, and the cardiologist indicated that if neurology felt that there was no other cause for Plaintiff's retinal occlusions, other cardiac treatments could be considered. T.872. In March of 2021, Plaintiff followed up and was advised that the occlusion was most likely vascular in origin, so no heart surgery was performed; Plaintiff reported mild lower extremity edema. T.873.

During mid to late-2020 through 2021, Plaintiff also received treatment from a neurologist. T.658-662; 854-856.   In July 2020, Plaintiff visited Dent Neurological Institute for consultation due to visual disturbances with floaters and feeling like he was looking through cracked glass or spiderwebs; he reported some headaches; his vision was worsening and worse in the light with pressure; it helped to rest. T.660. On exam, he had features of visual loss and cervical occipital neuralgia; an MRI and

4

MRA of the brain were ordered; and Magnesium, Tizanidine, and Lidocaine topical cream were prescribed. T.662.

In August of 2020, Plaintiff reported improved headaches and neck pain; an MRA of the brain showed at the center of the A-comm, there was focal flow widening measuring approximately 1mm, which could represent an infundibulum versus a very tiny aneurysm; the MRI of the brain showed large pineal gland cyst, evidence of hyperdynamic CSF flow through the aqueduct on the T2 sagittal image, the anterior horns of the lateral ventricles were dilated, prominence of the parietal sulci with widened central sulci and sylvian fissures along with anterior temporal lobe atrophy with prominence of the temporal horns of lateral ventricles bilaterally, could be suggestive of early evidence of an underlying primary neurodegenerative condition. T.655. His medications were continued. T.658; 763.

In the Fall of 2020, during follow-up visits with his neurologist, Plaintiff expressed concerns about decreased hearing and was willing to consider audiogram. T.761. He followed up with worsening pressure headaches and consistent with exacerbations from Valsalva maneuvers consistent with raised intracranial pressure headaches; Acetazolamide was prescribed. T.758-759. THC helped him sleep, and he had polarized glasses that helped his photophobia. T. 748. Intracranial pressure headaches were confirmed with increased opening pressure with the lumbar puncture, and Zonisamide was prescribed. T. 750-751; 753-755.

At one point, Plaintiff reported concerns for large bumps all over his body that were very itchy, T.812, and in September of 2021, Plaintiff underwent an annual skin exam and biopsy. T.944-948.

In 2021, Plaintiff reported blurred vision in both eyes of mild severity and occurring sometimes. T.840. He also reported swollen legs, that his hands cramped and hurt, and that he still had head pressure. T.825. He subsequently reported that his fingers turned purple in the cold. T.890. During August of 2021, Plaintiff underwent a general physical exam and follow up regarding a "myriad problems and issues." T.894.

In June of 2021, Plaintiff suffered from an episode of diverticulitis and chronic constipation. T.826. Plaintiff underwent a hernia repair in April 2021, see, T. 1012; 1019-1021, and he had overall fatigue and lack of energy since. T.846. A CT scan was ordered and showed diverticulosis of Plaintiff's colon. T.848-851. The diverticulosis was treated with drugs. T.1016-1017.

### B. Opinion Evidence

On October 14, 2020, Plaintiff underwent an internal medicine consultative examination with Dr. Nikita Dave, M.D. T.676-682. Plaintiff reported a hole in his heart, diabetes, hypertension, pneumonia, a history of chronic lymphoid leukemia, dyslipidemia, diverticulitis, possible vasculitis, Raynaud disease, sudden occlusion of the left retinal artery with loss of central vision in the left eye, intermittent skin lesions, headaches, low platelets, and hardness of hearing. T.676-678. On exam,

Plaintiff's right eye vision was 20/50 and left was 20/less than 200;[2] squat ½ down, stating bilateral knee pain; sensation was decreased distally in the fingers throughout; there was 1+ pitting edema of the lower limbs tested with compression socks on bilaterally; and unable to visualize varicosities due to compression socks. T.679-680. Dr. Dave diagnosed atrial septal defect pending cardiothoracic consult for possible surgical repair; left central retinal occlusion and visual loss; diabetes type 2, well-controlled on minimal medication; dyslipidemia on minimal medication; hypothyroidism on minimal medication; hypertension; per Plaintiff, diverticulitis, history of immunosuppression and Pneumocystis pneumonia; chronic lymphocytic leukemia; per Plaintiff, description of thrombocytopenia, being monitored; headaches, unclear and/or multifactorial etiology; possible vasculitis pending rheumatology consult for multiple reasons, including skin lesions, occlusion of the left retina, headaches, Raynaud disease, etc.; hardness of hearing; numbness of the distal fingers bilaterally; and leg swelling. T.680-681. Dr. Dave opined that Plaintiff may not be able to drive or operate sharp equipment and machinery due to vision, as well as thrombocytopenia based on his description with risk of bleeding at times; there may be mild to moderate limitations for fine hearing acutely, though he was able to hear normal volume of speech in the room, audiometric testing could be considered, though he had recently had it done; with regard to headaches and left eye vascular problem, Plaintiff believed he had some restrictions regarding lifting of

---

[2] A subsequent vision exam conducted on Plaintiff on May 4, 2021, revealed that Plaintiff had 20/40 vision in both eyes that was corrected to 20/20 vision in both eyes when he wore his glasses. T.841.

weights; there may be moderate to marked limitations for heavy lifting, carrying, pushing, pulling, repetitive bending forward, and such activities that may increase intraocular pressure (with a question mark), though further deferred to his retinal specialist in terms of diagnosis and restrictions; avoid ladders and unprotected heights; he may be best benefited for seated posture, sedentary postures, and light activities interspersed with rest as tolerated. T. 681.

On January 7, 2021, Dr. D. Brauer, M.D. reviewed Plaintiff's file as it existed on that date and opined that Plaintiff had no exertional limitations but should avoid concentrated exposure to noise and hazards. T.107-109.

On April 14, 2021, Dr. H. Miller, M.D. reviewed Plaintiff's file as it existed on that date and opined that Plaintiff could perform medium exertion work; he should avoid Valsalva maneuvers; and he should avoid concentrated exposure to noise and hazards. T.89-93.

On December 27, 2021, Dr. Joseph DiPirro, M.D. completed a questionnaire; he listed Plaintiff's diagnosis as chronic lymphoid leukemia disease with a poor prognosis; Plaintiff experienced joint pain, fatigue, and pressure in his head. T. 983. Dr. DiPirro opined that Plaintiff experienced pain or other symptoms severe enough to constantly interfere with the attention and concentration needed to perform even simple work tasks; he was incapable of tolerating even low stress jobs because severe pain varied; he could not walk any city blocks without rest or severe pain; he could sit 30 minutes at a time and stand 20 minutes at a time; he could sit less than two hours and stand/walk less than two hours total; he needed to walk around every

8

minute for one minute; he needed to take unscheduled breaks at varied intervals for varied amounts of time; he could occasionally lift and carry less than 10 pounds, rarely 10 pounds, and never more; he could occasionally twist, rarely stoop, crouch/squat, and climb stairs, and never climb ladders; he was likely to have good and bad days; he was likely to be absent from work more than four days per month; and he had loss of vision in the left eye and severe joint pain limiting mobility. T.984-986.

### C. The ALJ's Decision

Following the established five-step sequential evaluation to determine whether Plaintiff was disabled within the meaning of the Act, *see*, *Bowen v. City of N.Y.*, 476 U.S. 467, 470-71 (1986), the ALJ found, at step one that Plaintiff had not engaged in substantial gainful activity since March 17, 2020, the alleged disability onset date. T.19. The ALJ found at step two that Plaintiff had the following severe impairments: acute branch retinal artery occlusion of the left eye; hypertensive retinopathy OU bilaterally; chronic posterior vitreous detachment OU; and chronic leukemia lymphoma of B-cell type in remission.  T.19.

The ALJ found at step three that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listing under 20 C.F.R., Part 404, Subpart P, Appendix 1 (the Listings).  T.19–20. Before proceeding to step four, the ALJ determined that Plaintiff retained the RFC to perform light work, except:

> he can never climb ladders, ropes or scaffolds, or crawl. He can occasionally climb ramps or stairs, stoop, crouch, and kneel. He may

9

>bilaterally frequently handle objects and perform gross manipulation. He may bilaterally frequently finger, that is, perform fine manipulation of small objects. He may bilaterally frequently feel. He is limited to occasional concentrated exposure to excessive vibration, dangerous moving machinery, and unprotected heights. He is limited to occupations requiring the ability to work with large objects and avoid ordinary hazards but cannot work with small objects, small print, or objects which require fine visual acuity, which is limited acuity such that he is unable to read fine print, 8pt font, but is able to read normal print, 12pt font, with his glasses.

T. 20.  See 20 CFR § 404.1567(b) (defining "light work" as lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds).

After consulting a vocational expert during the hearing regarding the effects of these limitations, see, T.69–70, the ALJ found at step four that Plaintiff could not return to his past relevant work.  T.71–73.  At step five, the ALJ found that Plaintiff could perform other work existing in significant numbers in the national economy, such as a bar tender, a food services manager, and a cafeteria food services worker performed at the light exertional level.  T.26; see also T. 72–73 (vocational testimony). On those bases, the ALJ found Plaintiff not disabled under the Act and denied his claim. T.27.

### D. The Instant Action

Plaintiff commenced this action, by and through his counsel, with the filing of a complaint on June 16, 2023. Dkt. 1. Plaintiff contends that the ALJ erred by: (1) assessing a highly specific RFC that was not based on substantial evidence or tethered to the record; and (2) failing to develop the record regarding Plaintiff's

hearing impairment. Dkt. 6-1, p. 13.  The Commissioner, on the other hand, interposed a brief in opposition to Plaintiff's motion and in support of its request for judgment on the pleadings.  Dkt. 9.

## IV.     APPLICABLE LAW

### A. Standard of Review

In reviewing a final decision of the SSA, a district court "is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (internal quotation marks and citation omitted). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. It is not this Court's function to make a *de novo* determination as to whether the claimant is disabled; rather, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn" to determine whether the SSA's findings are supported by substantial evidence. *Id*.

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." *42 U.S.C. § 405(g)*; *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982) ("Congress has instructed ... that the factual findings of the Secretary, if supported by substantial evidence, shall be conclusive."). "Under this 'very deferential standard of review,' 'once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would have to

conclude otherwise.'" *Bonet ex rel. T.B. v. Colvin*, 523 Fed.Appx. 58, 58-59 (2d Cir. 2013) (italics omitted) (quoting *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012). The issue is not whether substantial evidence supports the claimant's argument, but "whether substantial evidence supports the ALJ's decision." *Bonet ex rel. T.B.*, 523 Fed.Appx. at 59 (italics omitted).

"In determining whether the agency's findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Talavera v. Astrue*, 697 F.3d at 151 (internal quotations omitted).

### B. Legal Standard in Evaluating RFC

The RFC need not mirror any one medical opinion. *See Tiffany L. v. Comm'r of Soc. Sec.*, No. 1:20-CV-0677 (WBC), 2021 WL 3145694, at *4 (W.D.N.Y. July 26, 2021) (citing *Cook v. Comm'r of Soc. Sec.*, 818 F. App'x 108, 109-10 (2d Cir. 2020)); *see also Jennifer O. v. Comm'r of Soc. Sec.*, No. 1:20-CV-1474 (WBC), 2022 WL 2718510, at *4 (W.D.N.Y. July 13, 2022) ("[A]n RFC determination, even one containing highly specific limitations, is not fatally flawed merely because it was formulated absent a medical opinion.").  "[T]here is no blanket requirement that [an ALJ's] decision must be supported by a congruous medical opinion for it to meet th[e] evidentiary standard." *Rubin v. Martin O'Malley, Comm'r of Soc. Sec.*, 116 F.4th 145, 155 (2d Cir. 2024).  "Instead, the ALJ is 'entitled to weigh all of the evidence available to make an RFC finding that [is] consistent with the record as a whole.' " *Emmett K. v. Comm'r of Soc. Sec.,* No. 23-CV-6036-FPG, 2024 WL 445504, at *2

(W.D.N.Y. Feb. 6, 2024) (quoting *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013)). Specific limitations which are part of an RFC, "like the RFC as a whole, 'must be based on evidence in the record, not on an ALJ's own surmise.'" *Alexander P. v. Comm'r of Soc. Sec.*, No. 24-CV-145-FPG, 2025 WL 2978772, at *2 (W.D.N.Y. Oct. 22, 2025)(quoting *Wouters v. Comm'r of Soc. Sec.*, No. 19-CV-610, 2020 WL 2213896, at *2 (W.D.N.Y. May 7, 2020)).

## V. ANALYSIS

### A. *The ALJ's Determination Is Supported By Substantial Evidence*

Plaintiff argues that the ALJ erred in assessing an RFC that was not based on substantial evidence, since it contained "highly specific limitations which were not based on any opinion evidence of record or tethered to the record in any way." Dkt. 6-1, p. 14. Plaintiff claims that the ALJ erred in imposing the following specific limitations:

1. That Plaintiff may bilaterally frequently handle objects and perform gross manipulation, may bilaterally frequently finger, that is, perform fine manipulation of small objects, he may bilaterally frequently feel; and

2. That he cannot work with small objects, small print, or objects which require fine visual acuity, which is limited acuity such that he is unable to read fine print, 8pt font, but is able to read normal print, 12pt font, with his glasses.

*Id*. According to Plaintiff, these highly specific limitations were not based on any opinion before the ALJ, as they were limitations not addressed by any medical professional, and these were not based on Plaintiff's testimony. *Id*. This Court disagrees.

13

In finding that Plaintiff could perform light exertional work, the ALJ noted Plaintiff's testimony that he could usually lift 20 to 30 pounds, *see*, T.22 [citing T.54] and walk one mile per day. T.55. Further, on disability forms, Plaintiff reported that he can lift less than 50 pounds and walk one mile without needing to stop and rest. T.71; *see* 20 C.F.R. 404.1567 (defining "light work"); *see also Salinovich v. Comm'r of Soc. Sec. Admin.*, 783 F. App'x 67, 68-69 (2d Cir. 2019) (affirming the District Court's finding that Plaintiff could perform light work based in part on daily activities that showed she could walk one mile daily without rest or severe pain, and that the ALJ's RFC determination was supported by substantial evidence). Moreover, the ALJ's finding in this regard (light work) was more restrictive than the prior administrative medical findings of the State agency consultants who assessed medium exertional limitations, *see*, T.90, which the ALJ found was inconsistent with Plaintiff's testimony that he could not lift that much. T.54.

Regarding the limitation that Plaintiff may bilaterally frequently[3] handle objects and perform gross manipulation, may bilaterally frequently finger, that is, perform fine manipulation of small objects, he may bilaterally frequently feel, the Court finds adequate support in the record to justify such limitations. These manipulative limitations in the RFC were imposed to account for Plaintiff's non-severe Raynaud's Phenomenon. T.24, 26. At the hearing, Plaintiff testified that when he starts having a

---

[3] "Frequently" means "occurring from one-third to two-thirds of the time." SSR 83-10, 1983 WL 31251, at *6 (Jan. 1, 1983). As one Judge on this Court has recognized, "limiting a claimant to doing a task only 'frequently' is a more significant limitation than one might think." *Daniel M. v. Comm'r of Soc. Sec.*, No. 23-CV-0671-LJV, 2025 WL 2783005, at *4 (W.D.N.Y. Sept. 30, 2025).

circulation problem in his hands due to the cold weather, it can affect his grip such that holding small objects (*e.g.,* pens) is difficult; however, for larger objects, he can still grab onto them when his hands are cold, but the best grip on the large objects is when his circulation comes back. T.53–54. Plaintiff's hearing testimony supports the ALJ's limitation in the RFC for "work with large objects," frequently handle of objects, and frequent performing fine manipulation of small objects. T.20. Moreover, Dr. DiPirro indicated that Plaintiff does not have significant limitations with reaching, handling or fingering. T.986.  Under these circumstances, the RFC regarding manipulation and fingering is consistent with the record as a whole.  *See*, *Larson v. Comm'r of Soc. Sec.*, 2020 WL 5018331, at *11 (W.D.N.Y. Aug. 25, 2020) ("In assessing the additional postural, handling, and fingering limitations, the ALJ seemingly gave [Plaintiff] some benefit of the doubt regarding her complaints of pain and the restrictions [Plaintiff] herself claimed were associated with her [impairment].").

The RFC limitation for "fine visual acuity" is based on Plaintiff's vision impairment. Although the State agency consultants assessed no visual limitations, *see*, T.91, 107, noting that Plaintiff's right and left vision were 20/25 (OD) and 20/60 (OS), respectively, *see*, T.93, 109, the ALJ found greater limitations. *Jacob M. v. Comm'r of Soc. Sec.*, No. 20-CV-1093-FPG, 2022 WL 61007, at *5 (W.D.N.Y. Jan. 6, 2022) ("where an ALJ makes an RFC assessment that is more restrictive than the medical opinions of record, it is generally not a basis for remand."). Upon reviewing the record, the ALJ explained that she found evidence of no ocular complications or

15

diabetic retinopathy (damaged blood vessels).  T.22  (citing T.600). But she also found in the record subjective visual disturbance of the right eye, a magnetic resonance imaging (MRI) of the brain that showed central retinal artery occlusion (blood blockage) of the right eye, and evidence of visual loss and occipital neuralgia (inflamed nerves) to a mild degree.  T.23 [citing T.657–58 (noting "intact visual acuity" and improved visual loss and occipital neuralgia)]; *see also* T.599 (noting associated symptoms and "activity affected: reading").

Despite finding some evidence of mild, blurry vision bilaterally on occasion, the ALJ noted that evidence before her supported the conclusion that Plaintiff's vision problems were not that severe.  At his hearing, Plaintiff testified that wearing his glasses took the blurriness out of his eyes. T.50.  Such testimony, combined with his testimony that he continued to drive and carry a firearm, seemed to contradict, as the ALJ noted, Plaintiff's claim of vision impairment. T.60. In the face of such suggestion by the ALJ, Plaintiff's counsel requested that the ALJ impose some "visual restriction at least in terms of fine acuity."  T.60.  The ALJ's RFC acceded to counsel's request.

Moreover, Plaintiff's medical records demonstrate that on May 4, 2021, Plaintiff's vision was tested and it was determined that his visual acuity (VA) refraction was 20/40 (uncorrected) and 20/20 (corrected) in both eyes, and he had normal and clear cornea, no diabetic neuropathy bilaterally, normal periphery bilaterally, and normal eyelids, iris, and lens. T.840–42. A consultative physician

16

determined that Plaintiff had no visual limitations based on recent ophthalmological and retina specialist notes.  T.836.

As for the specific limitation in the RFC for "cannot work with small objects, small print, or objects which require fine visual acuity, which is limited acuity such that he is unable to read fine print, 8pt font, but is able to read normal print, 12pt font, with his glasses," *see*, T.20, the ALJ explained at the hearing that Plaintiff can read normal print with his glasses on, *see*, T.70; *see also* T.50 (Plaintiff's testimony that the glasses "takes the blurriness out of [his] eyes"); T.599 (noting associated symptoms and "activity affected: reading"). Regarding the "other jobs" that the ALJ found Plaintiff could perform in significant numbers at step five, *see*, T.26, the vocational expert (VE) testified that questions regarding the font and the small objects were based on the VE's experience as a vocational counselor of over 20 years. T.75.  While the ALJ went along with Plaintiff's counsel request for a "visual restriction at least in terms of fine acuity," T.60 , the ALJ determined that greater limitations were not warranted because Plaintiff could still drive, shoot a gun, and read with his glasses. T.21 (ALJ's finding that Plaintiff "drives approximately 3 to 4 times a week" to attend appointments); T.60 (ALJ's discussion at the administrative hearing that Plaintiff's ability to drive makes his visual impairment not disabling).

Because the ALJ was "entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole," *Matta v. Astrue*, 508 F. App'x at 56, and because the ALJ did just that, the ALJ's RFC determination was supported by substantial evidence, and this Court will not second guess it.

17

### B. *The ALJ Did Not Fail to Develop the Record*

Plaintiff next argues that the ALJ failed to develop the record for evidence relating to Plaintiff's alleged hearing impairment. Dkt. 6-1, pp. 18-19.  Notably, Plaintiff did not allege at all on his disability forms for social security that he had a hearing impairment.  T.257.  Plaintiff did not testify that he suffered from any hearing impairment, nor did he allege that this impairment caused any functional limitations. T.48–59. He also did not display hearing difficulties at the hearing, nor did he, through his attorney, tell the ALJ that records regarding his hearing were missing from the record. Nevertheless, he now argues for the first time that the ALJ should have further developed the record regarding his hearing impairment.  Such contention is without merit.

On October 1, 2020, Plaintiff was treated at Dent Neurological and expressed concerns about his decreased hearing and indicated that he was "willing to consider" an audiogram.  T.761.  Thereafter, the medical source statement from an October 14, 2020, consultative examination, indicated that, "[t]here may be mild to moderate limitations for fine hearing acutely, though he was able to hear normal volume of speech in the room today and, therefore, can consider audiometric testing if needed, though the claimant recently had it done." T.89. 101, 106.  While Plaintiff reported "hardness of hearing tested at Dent in 2020," the report indicated that Plaintiff was "[a]ble to hear normal volume of speech in the room, not advised to wear hearing aides." T.92, 109.  Plaintiff now seeks to ascribe blame to the ALJ for failing to secure hearing test records from Dent. The record belies Plaintiff's claim.

18

During the initial and reconsideration stages of review, Disability Determination Services (DDS) requested records from both Invision Health and Dent Neurological Institute. T.85–86, 678 (noting Plaintiff's allegation that he had hearing testing performed at Dent), T.800 (noting DDS's confirmation that additional records from Invision Health, Dent, and ENT [ear, nose, throat] were obtained); and T.686–769 (records from Invision Health and Dent Neurological Institute received). Thus, the record confirms that the agency twice sought records from Plaintiff's sources to obtain records that pertained to his alleged hearing tests and, thereby, made "every reasonable effort" as a matter of law to update the record in his case. 20 C.F.R. § 404.1512(b)(i).

Moreover, aside from Plaintiff's subjective complaints, there is evidence in the record which establishes that Plaintiffs hearing was normal. A report from Southtowns Neurology, dated April 5, 2021, indicates that while Plaintiff complained of hearing loss, *see*, T.855, 857, a physical exam revealed that, his "[h]earing is intact for his age." T.858. Further, during an April 16, 2021, examination by Dr. Michael Stanley, Plaintiff "[d]enie[d] hearing change and hearing difficulty." T.890. Finally, during a December 27, 2021, visit with Dr. Dipirro, Plaintiff did not report hearing difficulties despite specifically being asked about them. T.986. *See Francisco v. Comm'r of Soc. Sec.*, No. 13CV1486 TPG DF, 2015 WL 5316353, at *11 (S.D.N.Y. Sept. 11, 2015)(noting that "an ALJ is not required to attempt to obtain additional evidence to fill any gap in the medical evidence; rather an ALJ is required to do so only where the facts of the particular case suggest that further development

is necessary to evaluate the claimant's condition fairly")(emphasis in original); *see also Rosa v. Callahan*, 168 F.3d 72, 79 n. 5 (2d Cir.1999)("[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information ....")(quoting *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir.1996)); *Sampson v. Saul*, No. 19CIV6270PAESN, 2020 WL 6130568, at *6 (S.D.N.Y. Oct. 16, 2020).

## VI.   CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings (Dkt. 6) is **DENIED** and the Commissioner's motion for judgment on the pleadings (Dkt. 9) is **GRANTED**. Plaintiff's complaint is **DISMISSED** in its entirety with prejudice. The Clerk of the Court is directed to close this case.

**IT IS SO ORDERED**.

                                        *s/Richard J. Arcara*
                                       HONORABLE RICHARD J. ARCARA
                                       UNITED STATES DISTRICT COURT

Dated: February 17, 2026
        Buffalo, New York